FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAR 26 PM 3: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| NATIONAL HERITAGE MORTGAGE CORPORATION,<br><br>    Plaintiff and counterclaim defendant,<br><br>vs.<br><br>HOMESIDE LENDING, INC.,<br><br>    Defendant, counterclaim plaintiff and third-party plaintiff.<br><br>vs.<br><br>JERRY O'NEAL,<br>    Third-party defendant. | CASE NO. CV 96-BU-3387-S<br><br>ENTERED<br><br>MAR 26 1999 |

## Proposed Memorandum Opinion

This cause comes on to be heard on various cross-motions for summary judgment, a motion to dismiss and on a motion to compel the deposition testimony of Jerry O'Neal. The first motion, filed on October 31, 1997, is a motion for summary judgment filed by the defendant, Homeside Lending ("Homeside"), on claims of fraud, deceit, breach of contract and conversion brought by National Heritage Mortgage Corporation ("National Heritage"). Also before the court is a motion

73

for summary judgment filed by National Heritage against Homeside Lending on October 31, 1997.[1] Third-party defendant Jerry O'Neal ("O'Neal") has filed two motions against Homeside, one to dismiss and one for summary judgment, both filed on October 31, 1997. After entry of an order by this court on December 29, 1998, requesting rebriefing of these motions by the parties, both Homeside and National Heritage renewed their motions on February 9, 1999, and submitted briefs and evidence pursuant to those motions. O'Neal did not resubmit briefs or evidentiary submissions in support of either motion. Because O'Neal has failed to comply with this court's instructions, the court will consider both motions of O'Neal to have been withdrawn, without prejudice. Finally, before the court is a motion to compel the testimony of Jerry O'Neal filed by Homeside on October 28, 1997.

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[1] The sole basis for this motion is that the six-year statute of limitations on contract actions is a bar to Homeside's claims that National Heritage breached its contract to buy-back mortgages sold to Mortgage Corporation of the South (a predecessor to Homeside) that were either delinquent in excess of sixty days, without a mortgage insurance certificate or without remittal by National Heritage of the mortgage insurance premium. Homeside responds that in a letter dated September 19, 1991, National Heritage president O'Neal ratified the debt on behalf of the company and himself, restarting the statute of limitations on that date. In a letter sent to O'Neal on September 5, 1991, by Hugh Harris of BancBoston Mortgage Corporation (a predecessor of Homeside), O'Neal was requested to sign and ratify the statements in the letter including admission that "[t]o date, National Heritage . . . owes BancBoston Mortgage Corporation . . . approximately $580,629.50 in connection with mortgages sold to [Mortgage Corporation of the South] by [National Heritage]. . . ." Attached to the letter is a list of those loans that National Heritage was obligated to buy-back, detailing the reasons for the buy-back necessity, listing various loans in delinquency, loans on which BankBoston paid the mortgage interest premium and loans on which a mortgage insurance certificate was unavailable. The letter also states that O'Neal and National Heritage will assign excess service fees then assigned to First Alabama Bank to BancBoston as well as pay to BancBoson any sum not paid off as a result of the assignment. This letter constitutes a "clear and definite acknowledgment of [a] debt . . . and an unequivocal promise to pay." *Pollak v. Billing*, 131 Ala. 519, 32 So. 639, 642 (Ala. 1902) (citing *Chapman v. Barnes*, 93 Ala. 435, 9 So. 590). *See also Bonded Builders & Supply Co. v. Long*, 264 So.2d 518, (Ala. 1972). National Heritage claims that O'Neal's signature is a forgery. This, however, is an issue for trial. A reasonable trier of fact could conclude that the counter-defendant acknowledged its debt; National Heritage's motion for summary judgment will therefore be DENIED.

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant's burden is not meager; it must illuminate, either through evidence on file or, where no such evidence can be presented, through affirmatively pointing out the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary

judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

Facts

The instant action involves a set of transactions entered into between National Heritage and Homeside, or its predecessors, relating to the servicing of mortgage loans. National Heritage was a mortgage lender from 1982 through 1991, originating mortgage loans and selling the principal and interest on those loans to investors. It would then either service the loan itself or would sell the rights to service those loans to a mortgage servicing company, such as the defendant, Homeside.

On September 30, 1983, National Heritage entered into a twelve-month commitment with Federal National Mortgage Association ("Fannie Mae") under which National Heritage would sell to Fannie Mae the principal and interest on first-mortgage loans. Afterwards, in 1983 and 1984, National Heritage originated a series of adjustable rate mortgages that were sold to Fannie Mae. The parties dispute whether these loans were sold to Fannie Mae at par — i.e., at the face value of the principal of the loans — or at a discount — meaning that Fannie Mae purchased the loan at less than its face value for reasons stated in its guidelines[2] — and neither party points to evidence clearly elucidating the matter. In addition to selling the principal and interest of the loan, the originator may also sell the rights and obligations inherent in servicing the loan. The business purchasing the servicing rights and obligations "services" the loan — by, for example, collecting payments and

---

[2] Fannie Mae may elect to purchase loans at a discount where, for example, the interest rate on the loan is such that it will not see a fair return on its investment unless the loan is purchased for less than its face value. The purchase advices indicating the sale of the loans to Fannie Mae from National Heritage, while stating a discount amount on the purchase of several of the loans, do not indicate whether these are "discounts" in the sense indicated by Fannie Mae's guidelines or whether the term is being used in another sense without the consequences of a purchase of the loan at a discount by Fannie Mae.

policing the loan — and obtains the right to a portion of the income from the loan, usually, some small percentage of each collected premium. Soon after entering the commitment with Fannie Mae to sell it loans, National Heritage entered into a commitment with Homeside's predecessor, Mortgage Corporation of the South ("MCS"), for MCS to service the loans sold to Fannie Mae. In addition to the interest and principal sold to Fannie Mae, and the servicing fees sold to MCS, there remained an additional income from the loan that National Heritage kept, the excess servicing fees, i.e. certain yields of the loan in excess of the normal servicing fees available to a loan servicer and above Fannie Mae's expected yield.[3]

Under Fannie Mae's guidelines, if Fannie Mae purchases the mortgage at par, the servicer (or the seller of the loan, if the excess fees are not transferred to a servicer, as is the case here) can receive the following in excess fees:

> If [Fannie Mae] purchased the mortgage at *par*, the servicer retains until the first interest rate change any excess above the difference between the "net mortgage rate" and our required yield. After that, the servicer may retain the amount by which the "net mortgage margin" exceeds our required margin.
> If [Fannie Mae] purchased the mortgage at a *discount*, the servicer retains until the first interest rate change any excess above the difference between the "net mortgage rate" and our required yield. After that, the servicer receives no excess.
> *"Net mortgage rate" is determined by subtracting the ½ % minimum servicing fee from the mortgage interest rate. "Net mortgage margin" is determined by subtracting the ½ % minimum servicing fee from the margin specified in the mortgage instrument.*

Defendant's Exhibit 5 at 164 (emphasis in original).

On June 30, 1987, MCS entered into an agreement with National Heritage to purchase the excess servicing fees from Homeside. Under that agreement, MCS was obligated to pay National Heritage a maximum of $1,185,979.00 for the excess servicing fees. MCS was required to accomplish this payment by providing to National Heritage, for each month until the full amount was paid, the total amount of excess fees received by MCS. However, if MCS never received sufficient excess servicing fees to reach the $1,185,979.00, it was not obligated to make up the difference. Essentially, the deal was for MCS to collect any excess servicing fees up to $1,185,979.00 and forward them to National Heritage; any sum above that amount, MCS was free to keep.

---

[3] The parties have done a somewhat poor job in explaining what these assorted terms mean. The court would hope that the parties can do a better job of explaining to a jury these terms and how the values attached to these terms are to be calculated. The court is considering whether an expert witness should be appointed under Federal Rule of Evidence 706 to aid in the clarification of these matters.

Fifteen days later, on July 15, 1987, National Heritage assigned the excess fee agreement between it and MCS to First Alabama Bank in exchange for a $618,000.00 loan. The agreement between First Alabama Bank and National Heritage required National Heritage to begin repayment in monthly installments of $15,674.08 to First Alabama Bank beginning September 5, 1987. This payment was to be made, at least in part, from excess servicing fees collected by MCS. The payments from MCS allegedly made up nearly the entire premium amounts through 1987 and into 1988.

In 1988, BancBoston acquired MCS, computerized the accounting department and, allegedly, changed accounting methods. This surreptitious change in methods, the plaintiff complains, was taken without its knowledge and was in violation of MCS's contract with it. As indicated in a February 22, 1989, letter sent from Katherine Francies, a vice president at BancBoston, to Charles Watkins ("Watkins") at First Alabama Bank and carbon-copied to O'Neal, BancBoston determined that it was overpaying excess servicing fees to First Alabama Bank beginning in April of 1988.

> As you[] can see from the schedule, you were due $88,818.69 for 04/01/88 through 12/31/88. Since these fees were not set up on our system, we paid [] $13,706.00 per month during that time period. This represented the average of the January, February, and March, 1988 remittances. In all, we sent you 9 payments of $13,706.00 for a total of $123,354.00. The difference between these estimated payments and the amount actually due you is $34,535.31, which was overpaid. We have agreed that I will withhold half of each month's payment in 1989 until we are repaid. This month I have withheld $4,617.18 leaving a balance due us $ 29,918.13.

Plaintiff's Exhibit 15. In response to the letter, O'Neal contacted Watkins, who told him that the overpayment was due to "a lot of payoff and refinances." According to the plaintiff, because of the nature of the real estate market at that time, he had no reason to question this explanation. However, BancBoston, and its successor, Homeside, continued to pay less than the expected amount in excess servicing fees to First Alabama Bank. Plaintiff contends that he did not discover this until 1995, when he determined that the First Alabama Bank loan had not been paid off and he investigated why this was so. It was allegedly then that O'Neal discovered that there had not been the expected number of payoffs and refinances, but rather that BancBoston and its successor Homeside had secretly changed accounting methods, resulting in a loss to the plaintiff.

## Contentions & Analysis

Homeside claims that the plaintiff cannot raise a genuine issue of triable fact as to any of its claims of fraud, deceit, breach of contract and conversion (1) because all of the claims are barred by the applicable statutes of limitations, (2) because the plaintiff cannot prove the elements of conversion and (3) because the plaintiff cannot claim breach, as Homeside did not owe the plaintiff excess servicing fees on most of the loans originated by it after 1988.

### I. STATUTE OF LIMITATIONS.

Under § 6-2-38(1) and § 6-2-3 of the Alabama Code of 1975, all actions for fraud and deceit must be brought within two years after "the plaintiff discovers the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care. *Hickox v. Stover*, 551 So.2d 259 (Ala. 1989)." "The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud." *Hicks v. Globe Life & Acc. Ins. Co.*, 584 So.2d 458, 463 (Ala. 1991).[4] The defendant claims that the letter sent by BancBoston to First Alabama Bank and carbon-copied to O'Neal should have put the plaintiff on notice of any alleged fraud or deceit. The plaintiff responds that upon receiving the letter, O'Neal undertook a reasonable inquiry to determine the existence of fraud by calling First Alabama Bank and thus, could not have discovered the fraud earlier than in 1995 when it was actually revealed to him. The court disagrees with this reasoning of the plaintiff. Upon learning that BancBoston was not paying the full amount of excess fees, it was not reasonable for O'Neal to call First Alabama Bank to determine the cause of that reduction in payment. As the payee, First Alabama Bank may be poorly informed or uninformed of the reasons for the reduction in payment. Rather, O'Neal was required to determine from the representatives of BancBoston why it was paying less. Therefore, the plaintiff's claims of deceit and fraud are barred by the two-year limitations period, which ran in February of 1989.

The statute of limitations will not bar the plaintiff's contract claim or all of plaintiff's

---

[4] In *Foremost Ins. Co. v. Parham*, 693 So.2d 409 (Ala.1997), the Alabama Supreme Court drafted a new rule to govern all cases filed after March 14, 1997. The instant case was filed before that date; therefore, the earlier standard applies.

conversion claims, however. Section 6-2-34(4) states that "[a]ctions founded on promises in writing not under seal" such as the contract action brought in the instant case, "must be commenced within six years." It is a tenet of Alabama law, however, that "the statute of limitations does not begin to run against the payee until the last installment is due and unpaid." *Williams v. Williams*, 497 So.2d 481, 482 (Ala. 1986). The last payment of Homeside came well within this period as payments were allegedly made into 1995. The contract claim will not be dismissed for statute of limitations reasons.

As to the conversion claims, the plaintiff admits that all conversion claims based upon events occurring prior to the six year limitations period set forth in § 6-2-34(3) should be dismissed.

II. CONVERSION.

The defendant states that the plaintiff is incapable of stating a conversion claim because the excess servicing fees allegedly converted are not specific and readily identifiable. Under Alabama law, "[t]o establish conversion, one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Crown Life Ins. Co. v. Smith*, 657 So.2d 821,823 (Ala. 1994). As the Alabama Court of Civil Appeals recently stated:

> "It is generally accepted that an action for the conversion of money will not lie unless there is 'specific money capable of identification.'" *Coffee County Bank*, supra, at 151. As our economic system has become more sophisticated, making use of devices such as checks and electronic transfers of money, the idea of "specific money capable of identification" has become complicated. The Alabama Supreme Court has recognized the complication, holding that, "[n]ow, in conversion cases, the courts are not confronted so much with a particular piece of money, i.e., a coin or a bill, but with identified or segregated sources from which money has come or types of accounts into which money has been deposited." *Lewis v. Fowler*, 479 So.2d 725, 726 (Ala.1985).

*Citizens Bank of Moulton v. Jones*, 671 So.2d 737, 740 (Ala. Civ. App. 1995). A conversion action requires that the funds allegedly converted be, in some sense, specific, pre-existing objects in which a property interest could accrue, for example, a set of funds already put aside or a check already written, as opposed a mere obligation to pay some funds in fututre. "An action alleging conversion of cash lies only where the money involved is 'earmarked' or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum." *Crown Life Ins. Co. v. Smith*, 657 So.2d

at 823. While the plaintiff attempts to assert that there was a preexisting value of excess charges prior to the defendant's alleged conversion in which a property interest could lie, this cannot be so. Here it is unclear how much money in excess fees could be collected in each month, except retrospectively. Individuals could pay off or refinance loans, or mortgagors could go into bankruptcy. Any of these contingencies could affect the incoming amount of excess service fees. On such an uncertain amount, no property interest could lie. The plaintiff's conversion claim(s) will be dismissed.

III. BREACH OF CONTRACT.

The defendant argues that the plaintiff's breach of contract claim fails because, by 1988, National Heritage no longer owed National Heritage the amount of excess servicing fees that are claimed by the plaintiff under the agreement. This is so, contends defendant, because a significant number of the mortgages on which those fees were based were purchased by Fannie Mae at a discount and because no excess servicing fees can be collected on a mortgage purchased by Fannie Mae at a discount past the first interest rate change. By 1988, such an interest rate change had occurred with respect to all of the adjustable rate mortgages, Homeside asserts, and therefore, National Heritage was no longer entitled to excess mortgage fees. Further, MCS, to whom National Heritage sold the excess service fees, was no longer obligated to forward such charges to National Heritage as no excess service fees existed any longer on the "discount" loans. The court agrees that if a loan was purchased by Fannie Mae at a discount, under Fannie Mae's guidelines, there could be no excess servicing fees after the first interest rate adjustment. However, while it appears from the face of the purchase advices that the term "discount" is utilized in the sense indicated in Fannie Mae's guidelines, the court cannot be certain, as the defendant has failed to put forward such definition in Fannie Mae's guidelines such as to require the plaintiff to respond.[5]

Therefore, on the breach of contract claim, the defendant's motion for summary judgment will be denied. Despite that the plaintiff's claims on this issue seem extraordinarily weak, some weak

---

[5] Although the matter is not now before it, the court also questions whether, if the plaintiff is not entitled to approximately $200,000.00 that Homeside allegedly overpaid to First Alabama Bank on National Heritage's behalf, who is. It would seem that if, under Fannie Mae's guidelines, there can be *no excess servicing fees*, that Homeside is not entitled to the money either; rather, it should be forwarded to Fannie Mae. As such, it appears to this court that Fannie Mae should be joined to this suit, to promote judicial economy and as there is the possible consequence of an inconsistent judgment or a double recovery if Fannie Mae later seeks the monies from either Homeside or National Heritage.

cases must proceed to trial.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (Documents 26 & 53) will be GRANTED, in part, and DENIED, in part. All of plaintiff's claims, except the breach of contract claim, will be DISMISSED, with prejudice. O'Neal's motion for summary judgment (Document 30) and his motion to dismiss (Document 29) will be deemed WITHDRAWN and, therefore, MOOT. National Heritage's motion for summary judgment (Documents 28 & 55) will be DENIED. Defendant's motion to compel O'Neal to appear for a deposition (Document 24) will be GRANTED. O'Neal will appear for a deposition within thirty (30) days after the entry of the order accompanying this opinion.